**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Juan De La Cruz, | No. CV-21-08253-PCT-SPL (ASB) |
| Plaintiff, | |
| v. | **ORDER** |
| Navajo County, et al., | |
| Defendants. | |

Plaintiff Juan De La Cruz, who is currently confined in the Arizona State Prison-Kingman, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 concerning his medical care for an injury he sustained while he was a pretrial detainee in the Navajo County Detention Center (NCDC). Defendants move for summary judgment. (Doc. 111). Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 114), and he opposes the Motion. (Doc. 122).

## I.    Background

On screening the Second Amended Complaint (Doc. 29) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a Fourteenth Amendment medical care claim against Physician's Assistant (PA) Carter Anderson and Registered Nurse (RN) Dennis Montgomery in their individual capacities and a policy or practice claim against Navajo County Sheriff David Clouse in his official capacity and directed them to answer the claims against them. (Doc. 28).

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The Court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Evidentiary Issues

In setting forth the relevant facts below, the Court has drawn from Defendants' Statement of Facts (Doc. 112), as well as Plaintiff's Declaration (Doc. 123) and Second

Amended Complaint (SAC) since the SAC contains facts not included in his Declaration. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct").

Defendants argue that Plaintiff's Declaration is inadmissible because it was not submitted under penalty of perjury. (Doc. 139 at 2–3). Even without the explicit verification "under penalty of perjury," Plaintiff's firsthand statements may be used to oppose Defendants' Motion because "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); *Quanta Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014 WL 1246144, at *2 (D. Ariz. March 26, 2014) (citing cases) (material in a form not admissible in evidence, but which could be produced in a form admissible at trial, may be used to *avoid*, but not *obtain* summary judgment). Therefore, the Court may rely on Plaintiff's Declaration at the summary judgment stage.

Also, Plaintiff disputes nearly all of Defendants' 237 statements of fact. (*See* Doc. 124 (Pl.'s Statement of Disputed Factual Issues)). Where the Court has set forth the parties' differing version of events, the Court will not also note Plaintiff's disputes of those facts. In addition, many of Plaintiff's "disputes" are actually arguments about what Defendants should have been done differently or what NCDC policies required, but these arguments do not create a disputed issue of material fact, and the Court will not note "disputes" that are actually arguments.

Plaintiff also frequently objects to Defendants' facts, particularly those which cite to Declarations of Defendant Anderson, who is a licensed Physician's Assistant, and Defendants' experts S. Minter, who is a licensed Advanced Practice Registered Nurse, a double board-certified Family Nurse Practitioner, and an Adult Nurse Practitioner, and L.

3

Meaker, a licensed, board-certified Family Nurse Practitioner.  (*See, e.g.*, Doc. 124 ¶¶ 25, 27, 48, 61, 63, 77, 81–83, 87, 90–91, 96–101, 103–04, 106, 111–13, 124–25, 127–29, 134–35, 153–55, 167, 178, 180–81).  Plaintiff's objections to Defendants' facts citing to these Declarations are all a version of the following: "Objection. (1) Fed. R. Civ. Proc. 56(c)(2).  Defendant Anderson subject to expert disclosure under Fed. R. of Civ. Proc. 26(a)(2).  Testifying as to the standard of care; (2) Declarant Minter: Fed. R. Civ. Proc. 26(a)(2)(B)(ii.)  Lacking foundation; (3) Fed. R. Civ. Proc. 56(c)(2).  Minter's opinion failed to set forth the factual basis of applicable diabetes care practices and that the reasons for the opinion are unsupported by the material on which relied upon."  (*See id.* ¶ 25).

This type of objection is insufficient.  First, merely citing Rules of Civil Procedure, without explaining the basis for an objection is inadequate and leaves the Court to guess at Plaintiff's meaning.  Next, to the extent Plaintiff is asserting any or all of these Declarants are undisclosed experts, the Court notes that Defendants filed Notices of Service of Discovery on October 4, 2024 and November 15, 2024 asserting that they served Plaintiff with their Expert Reports and Supplemental Expert Reports, and Plaintiff does not specifically assert that Anderson, Minter or Meaker were not disclosed at that time.  (*See* Docs. 106, 110).  Moreover, Plaintiff has not offered any evidence showing that Anderson, Minter and Meaker are not qualified to offer the opinions they express based on either their treatment, reviews of Plaintiff's medical records, or the standard of care.  Therefore, Plaintiff's non-specific objections are overruled.

## IV.    Relevant Facts

Plaintiff was incarcerated in NCDC from approximately March 29, 2019 to March 19, 2020.  (Doc. 112 (Defs.' Statement of Facts) ¶ 1).  Plaintiff is a chronic care patient with Type 1 diabetes and requires daily insulin.  (Doc. 123 (Pl. Decl.) ¶ 4; Doc. 29 at 4).

On February 29, 2020, another detainee bit Plaintiff on the right hand during an altercation.  (Doc. 112 ¶ 2).  Plaintiff asserts that after the altercation, he immediately sought medical attention from staff and was taken by Officer Wong to an interview room where he was examined by Defendant RN Montgomery, who provided a couple of band-

aids and antibiotic ointment, but did not clean the wound with saline, did not apply ointment, did not cover the wound with gauze to prevent infection, and did not check Plaintiff's vitals.[1]  (Doc. 123 ¶¶ 5, 6; Doc. 124 ¶ 37.)

Defendants assert that there is no documentation of Plaintiff reporting any injury to medical on February 29, 2020.  (Doc. 112 ¶ 11).  And Plaintiff did not immediately notify medical or correctional staff that his wound came from a human bite and that it was not a cut.  (*Id.* ¶¶ 12, 13).  Plaintiff admitted at his deposition that he "would not say how I got the lesion on my hand."  (*Id.* ¶¶ 14–15).

Plaintiff asserts that during the night, he was taken to an observation cell because he was in severe pain and presented symptoms of lethargy, confusion, loss of concentration and complaints of chest discomfort, dizziness, fevers, cold sweats and shortness of breath. (Doc. 123 ¶ 9).  The next morning, Defendant RN Montgomery saw Plaintiff and observed a deep laceration on Plaintiff's hand, which was swollen and red, but Montgomery did not clean the wound with saline, apply ointment, or cover it with gauze to prevent infection, and Montgomery did not check Plaintiff's vitals.  (*Id.* ¶¶ 10–11).

Defendants assert that Montgomery observed minimal swelling in Plaintiff's hand on March 1 and that antibiotic ointment and wound coverage were appropriate initial treatments for a laceration.[2]  (Doc. 112 ¶¶ 24–25).  According to Defendants, the standard

---

[1] In the SAC, Plaintiff asserts that Defendant Montgomery came to his cell, not an interview room, and took photographs of the injury to his hand but gave no medical assistance.  (Doc. 29 at 4).

[2] Plaintiff disputes this statement because he "is a known diabetic and requires prompt attention and treatment for healing and the effectiveness of antibiotics, and to prevent serious and life-threatening health complications, including bacterial infections." (Doc. 124 ¶ 25).  Plaintiff also disputes most of Defendant's facts about the standard of care, asserting that Defendants have not set forth the standard of care for diabetic wounds, but Plaintiff does not present evidence about the standard of care for diabetic wounds or how it differs from the care he received and the evidence before the Court indicates that Defendant Anderson and Defendants' experts Minter and Meaker are qualified to opine as to the standard of care.  (*See id. e.g.*, ¶¶ 25–27, 45–47, 49, 63, 66, 77, 82, 87, 96–101, 103–04, 106, 111–13, 124–25, 127, 129, 155, 167, 180.)  Because Plaintiff does not present evidence about the standard of care for diabetic wounds, the Court will not note each time

of care required no additional treatment, referral, examination, or response by Defendant Montgomery or any other nursing staff.  (*Id.* ¶ 27). It was common for the nursing staff to provide multiple Band-Aids and single use tubes of antibiotic ointment to detainees for their own use in treating abrasions or minor lacerations, and this practice allows detainees to reapply wound coverage following exercise, showers, or at their discretion.  (*Id.* ¶¶ 28–29).  If a detainee required additional Band-Aids or antibiotic ointment, they could ask medical or security staff, and the Band-Aids and antibiotic ointment would be provided directly to them in their housing unit.  (*Id.* ¶ 30).

The first medical record related to Plaintiff's hand injury is Defendant Montgomery's note entered on March 2, 2020, indicating that Montgomery provided Plaintiff with antibiotic ointment and Band-Aids on March 1, 2020. (Doc. 112 ¶ 31).  The morning of March 2, 2020, Defendant Montgomery encountered Plaintiff again after he had complained of chest discomfort to security staff the night before and was brought to the medical unit.[3]  (*Id.* ¶ 32).  During the March 2 visit, Defendant Montgomery assessed Plaintiff's right hand, observed that it was red and swollen, and contacted the medical provider for orders.  (*Id.* ¶ 38).  After a medical provider authorized medications, Defendant Montgomery promptly administered Phenergan for nausea, Ibuprofen 600 mg for pain, and Augmentin 875/125 mg per the provider's orders, and noted that Plaintiff would be monitored.  (Doc. 112 ¶ 39).

Defendants assert that the administration of Augmentin was appropriate and within the standard of care for treatment of a bite because Augmentin is the drug of choice for prophylaxis antibiotic treatment (antibiotics prescribed to prevent infection), and the prescribed dosage is the standard for an adult.[4]  (Doc. 112 ¶¶ 46–47).  According to

---

Plaintiff disputes Defendants' statements about the standard of care.

[3] Plaintiff appears to assert that this encounter occurred in the NCDC Booking observation cell, not the medical unit.  (Doc. 124 ¶¶ 31–32).

[4] Plaintiff asserts that antibiotics are not good for diabetics, and diabetics receiving antibiotics should be monitored frequently, including through blood draws, but he does not present evidence to support this statement.  (Doc. 123 ¶ 21).

1    Defendants, the standard of care required no additional treatment or care at that time.  (*Id.*
2    ¶ 49).

3            On March 3, 2020, Defendant PA Anderson provided verbal orders to nursing staff
4    to discontinue Augmentin and start Plaintiff on Doxycycline 100mg and Clindamycin
5    300mg twice a day for seven days.[5]  (Doc. 112 ¶ 58).  Doxycycline and Clindamycin are
6    both broad-spectrum antibiotic choices, which are appropriate for the skin
7    infections/cellulitis with which Plaintiff was presenting.  (*Id.* ¶ 61).  Because Plaintiff's
8    hand did not improve on the Augmentin protocol, Defendant Anderson determined that
9    broad-spectrum antibiotics was an appropriate next course of action within the standard of
10   care for the treatment of his condition because Doxycycline and Clindamycin would
11   specifically target Methicillin-resistant Staphylococcus aureus ("MRSA") bacteria, which
12   was a concern once Plaintiff did not respond to the Augmentin.  (*Id.* ¶ 62).  On March 4,
13   2020, Defendant Anderson provided additional verbal orders to nursing staff to administer
14   Tylenol 1000mg up to three times a day to Plaintiff as needed for pain.  (*Id.* ¶ 65).  The
15   standard of care required no additional treatment or care at this time.  (*Id.* ¶¶ 64, 66).

16           Plaintiff asserts that his condition worsened over the next week, and from February
17   29, 2020, until his release from NCDC on March 19, 2020, he complained to the a.m. and
18   p.m. nursing staff at each daily insulin call.  (Doc. 29 at 5; Doc. 123 ¶ 19).  Plaintiff
19   complained each day to Defendant RN Montgomery when he received his daily insulin and
20   explained to Montgomery that the pain medication and antibiotics were ineffective.  (Doc.
21   29 at 5).  The pain and swelling did not subside and started to impact Plaintiff's ability to
22   perform daily activities, and he was unable to bend his finger or grasp anything with his
23   right hand.  (*Id.*).  Plaintiff asserts that Defendant Montgomery provided no medical

24

25   _____

26           [5] Plaintiff disputes this fact "[t]o the extent it is undisputed Defendant Anderson did
27   not immediately examine Plaintiff's right hand upon learning that his hand was swollen,
     red, and that he shows symptoms of lethargy, confusion, loss of concentration and
28   complaints of chest discomfort, dizziness, fevers, cold sweats and shortness of breath."
     (Doc. 124 ¶ 58).

7

treatment or x-rays and instead took photos each day of Plaintiff's injuries and sent him back to his cell.  (*Id*.).

On March 4, 2020, at 1:47 p.m., Plaintiff submitted his first post-injury medical request stating, "[I] would like 2 [sic] know the meds I was on b4 [sic] the meds that I am on now thank u [sic]".  (Doc. 112 ¶ 67).  Medical staff responded a half hour later that "you were initially put on the Augmentin, then it switched last night to doxycycline and clindamycin."  (*Id*. ¶ 68).

On March 6, 2020, Plaintiff was seen by RN Newby, who noted that Plaintiff's hand was swollen, warm, and tender to the touch and that Plaintiff felt lethargic, nauseous, and reported his pain as 8/10.  (*Id*. ¶¶ 69–70).  RN Newby notified Defendant Anderson of Plaintiff's condition at 10:25 a.m. and, based on her report, Defendant Anderson traveled to the facility to see Plaintiff for an in-person visit, which took place at 11:51 a.m.  (*Id*. ¶¶ 71–72).

Defendant Anderson documented that there was improved appearance, no discharge from the wound, decreased erythema, decreased swelling, and no chills or fever, but Plaintiff reported pain at 8/10 and feeling nauseated.  (*Id*. ¶¶ 73–74).  Plaintiff asserts that he reported that the pain and swelling had increased in his right index finger, and while Defendant Anderson prescribed pain medication and additional antibiotics, he did not order an x-ray.  (Doc. 29 at 5).  Defendants assert that based on PA Anderson's in-person assessment of Plaintiff's hand, Anderson ordered continuation of the antibiotics, Tylenol, and Meloxicam as needed for pain relief, and a follow up in one week.  (Doc. 112 ¶ 75). Anderson prescribed Meloxicam, a non-steroidal pain medication, because Plaintiff complained he was having increased pain and swelling.  (*Id*. ¶ 76).  The standard of care required no additional treatment or care at this time, and Defendant Anderson did not order an x-ray because, based on his in-person assessment of Plaintiff's hand, an x-ray was not clinically indicated for his condition.  (*Id*. ¶¶ 78, 81).  An x-ray is non-specific and generally unhelpful for diagnosis of potential osteomyelitis at this stage because an x-ray generally will not show any changes until an infection is advanced.  (*Id*. ¶ 82).  Probiotics

are not a pain medication, and it was appropriate and within the standard of care for PA Anderson to prescribe probiotics because antibiotics, including Clindamycin, can cause an alteration of beneficial GI flora, and probiotics protect against this side effect.  (*Id.* ¶¶ 86, 91).

On March 8, 2020 at 12:39 p.m., RN Newby saw Plaintiff in the medical unit and described Plaintiff's right hand as warm and swollen, but blanchable.  (*Id.* ¶ 92).  RN Newby contacted Defendant Anderson, who provided verbal orders by 12:42 p.m. that same day to discontinue the current antibiotics and to begin Augmentin 875/125mg twice daily and to inject 1gm Rocephin once intramuscularly.  (*Id.* ¶¶ 93–94).  Defendant Anderson also instructed nursing staff that if Meloxicam was not helping with Plaintiff's reported pain, Tramadol 50mg was to be given three times daily as needed for pain.  (*Id.* ¶ 95).  The purpose of prescribing Augmentin and Rocephin was to determine which would best treat the infection because different antibiotics and combinations of antibiotics are effective at treating different strains of bacteria, which can become resistant.  (*Id.* ¶¶ 96–97).  It is clinically recommended and within the standard of care to explore various antibiotic protocols if the patient does not exhibit the desired improvement to determine which antibiotic protocol is the most effective.  (*Id.* ¶ 98).  The standard of care required no additional treatment or care at this time.  (*Id.* ¶ 101).  Plaintiff's pain medications (Tylenol, Meloxicam, and Tramadol) were prescribed as needed, which means Plaintiff could decline their administration or request more as needed from nursing staff to address his pain in compliance with Defendant Anderson's orders.  (*Id.* ¶¶ 99, 102).

On March 11, 2020, Plaintiff saw RN Newby again due to his hand issues not resolving, and RN Newby noted Plaintiff's blood sugar had been elevated during her prior three shifts.  (*Id.* ¶¶ 107–08).  RN Newby contacted Defendant Anderson with an update on Plaintiff's condition, and Defendant Anderson provided verbal orders on March 11, 2020 to discontinue Augmentin and start Levaquin 750mg once per day, to start Flagyl 500mg three times per day for 14 days, as well as 1gm of Rocephin injected once intramuscularly, and 4 units of Lantus, which is a type of insulin, to address Plaintiff's

elevated blood sugar. (*Id.* ¶¶ 109–10). Levaquin, Flagyl, and Rocephin are another appropriate antibiotic regimen to order following the Rocephin and Augmentin protocol because it is appropriate and within the standard of care to try multiple antibiotic protocols if there is a lack of improvement in the patient's condition because bacteria can be resistant to various types of antibiotics. (*Id.* ¶ 111). The standard of care required no additional treatment or care at this time. (*Id.* ¶ 113).

On March 12, 2020, Plaintiff submitted a medical request asking what medications he was currently on and for fingernail clippers. (*Id.* ¶ 114). Medical staff responded that Plaintiff should "speak with the nurse at PM med pass about your medications. We do not give out fingernail clippers, you will have to ask the pod officer for those." (*Id.* ¶ 115). That same day, Plaintiff submitted a commissary request for 2 pepperoni pizzas and a soda, and staff responded that Plaintiff's commissary account was updated pursuant to the request. (*Id.* ¶¶ 116–17).

On March 13, 2020, at 10:47 a.m. Plaintiff submitted a medical request for two Tramadaol that night for pain. (*Id.* ¶ 118). Medical staff responded at 3:37 p.m. that they "can give what is dosed." (*Id.* ¶ 119). On March 14, 2020, Plaintiff requested two Tramadol for hand pain, and the response 45 minutes later said, "will send." (*Id.* ¶¶ 120–21). On March 16, 2020, Plaintiff requested two Tramadol for that night, and the response an hour later said, "will send this evening." (*Id.* ¶¶ 122–23).

On March 19, 2020, after his criminal defense attorney requested that Plaintiff be released to seek treatment for his hand, Plaintiff was released from NCDC with a 30-day supply of antibiotics. (*Id.* ¶ 164). Plaintiff testified at his deposition that he immediately sought care from an emergency department but was turned away because his condition was not life threatening and, due to the COVID-19 pandemic, emergency departments were only accepting patients with life-threatening emergencies at that time. (*Id.* ¶¶ 165–66).

Approximately 22 days after his release from NCDC, on April 10, 2020, Plaintiff followed up with an orthopedic hand specialist, Dr. Le, who noted that Plaintiff's symptoms of infection were improving, but had not completely resolved with antibiotics,

and that there was no active acute worsening infection, no obvious abscess or purulence, and no systematic symptoms. (*Id.* ¶¶ 168–70). Dr. Le ordered an x-ray, which revealed significant atherosclerotic plaque buildup throughout the vascular structures in Plaintiff's right forearm and into the right hand and fingers. (*Id.* ¶ 171). Atherosclerosis is a disease that occurs when plaque builds up in the walls of the arteries, narrowing them and reducing blood flow. (*Id.* ¶ 172). Significant atherosclerosis as noted by Dr. Le was a pre-existing condition Plaintiff had prior to being bit on February 29, 2020, because atherosclerosis is a slow progressing disease that usually takes several years to progress to the point of being identifiable via x-ray. (*Id.* ¶¶ 174–75). According to Defendants, Plaintiff's atherosclerosis could not have developed in the less than two months that elapsed between the bite injury on February 29, 2020, and Plaintiff's appointment with Dr. Le on April 10, 2020, and atherosclerosis was not and could not have been caused by the bite or osteomyelitis. (*Id.* ¶¶ 176–77). The combination of Plaintiff's significant atherosclerosis in his right forearm, hand, and fingers, combined with his status as a Type I diabetic, slowed the healing process of the bite. (*Id.* ¶ 178).

The x-ray taken by Dr. Le on April 10, 2020 did not show whether an infection was present in Plaintiff's right hand because an x-ray is only helpful in showing an infection when the infection is advanced. (*Id.* ¶ 179). If an x-ray is unhelpful in establishing whether infection is present because it is not advanced enough to display, then an MRI may be ordered to further assess for infection, but the standard of care does not require that an MRI be ordered to determine if infection is present until multiple antibiotic regimens have been unsuccessful and an x-ray has proven to be unhelpful. (*Id.* ¶¶ 182–83). Defendant PA Anderson was still in the process of trying appropriate antibiotic regimens when Plaintiff was released from NCDC and, at that time, an x-ray would have been unhelpful in assessing Plaintiff's condition as demonstrated by its failure to show an infection when ordered by Dr. Le approximately 22 days after Plaintiff's release from NCDC. (*Id.* ¶ 184). Dr. Le ordered an MRI on April 10, 2020 to evaluate the extent of any remaining infection, further demonstrating that an x-ray while Plaintiff was detained at NCDC was not clinically

indicated or required by the standard of care, and that, even if the x-ray was ordered, it would not have shown an infection and therefore would not have changed Plaintiff's course of treatment at NCDC.  (*Id.* ¶ 185).

Dr. Le's report contained the following Impression & Recommendations:

> Right hand human fight bite injury to the index MCP area, subacute
>
> -I discussed management of this with the patient given the subacute nature of this. His symptoms have improved however not resolved with antibiotics. There is no active acute worsening infection or obvious abscess/purulence right now. No systemic symptoms.
>
> -However given his multiple medical comorbidities including diabetes I would consider possible right hand irrigation and debridement down to the joint.  First I ordered an MRI of the right hand stat to evaluate for osteomyelitis/abscess to determine the extent of any infection remaining. If there is an abscess/continued deep infection, he would likely benefit from surgery and require inpatient hospital stay for IV antibiotics and transition to oral antibiotics. I discussed with him risks of any surgery given his atherosclerotic plaques and vascular disease and diabetes, including nonhealing wounds.

(Doc. 112-4 at 27).

Dr. Le advised that, because the MRI showed infection, Plaintiff would likely benefit from surgery; despite the risks and multiple comorbidities, Plaintiff agreed to have surgery.  (Doc. 112 ¶¶ 186, 188).

Four days later, on April 14, 2020, Dr. Le performed surgery on Plaintiff's right index finger which included irrigation and debridement of Plaintiff's right index finger as well as obtaining a tissue diagnosis via a tissue culture to narrow down optimal antibiotics. (*Id.* ¶¶ 189–91).

Dr. Le's preoperative notes indicate that MRI findings included osteomyelitis of the index metacarpal and proximal phalanx; osteomyelitis is an infection of the bone and bone marrow, typically caused by bacteria.  (*Id.* ¶¶ 192–93).  Osteomyelitis takes time to develop because an infection does not transition to osteomyelitis until it has transitioned from the

skin to the bone. (*Id.* ¶ 194). Plaintiff's hand injury occurred on February 29, 2020, he was released from NCDC on March 19, 2020, and an additional 22 days passed before Plaintiff's first appointment with Dr. Le on April 10, 2020. (*Id.* ¶¶ 195–96). There are currently no medical records to establish what, if any, treatment Plaintiff received between his release from NCDC and his first consult with Dr. Le on April 10, 2020, and given that osteomyelitis takes time to develop, it is impossible to say to a reasonable degree of medical probability that osteomyelitis developed while Plaintiff was detained at NCDC, and it is much more likely that it developed after his release. (*Id.* ¶¶ 197–99).

Dr. Le's notes following the surgery indicate that the tissue culture was inconclusive in determining the type of bacteria present. (*Id.* ¶¶ 205–06). In response, Dr. Le prescribed Plaintiff Augmentin—the same antibiotic ordered by Defendant PA Anderson. (*Id.* ¶ 207).

Plaintiff is a Type I diabetic on insulin, which is a contributing factor to his hand injury and healing. (Doc. 112 ¶ 124). Tight blood sugar control is necessary for full wound healing, and multiple times during his detention at NCDC, Plaintiff refused or changed his insulin dosing against providers' orders, causing resultant elevated blood sugar. (*Id.* ¶ 125). During his time at NCDC, Plaintiff's blood sugar was often in flux because he was a self-dosing diabetic, meaning he would dictate the amount of insulin he was willing to take from nursing staff based on his own assessment of his blood sugar status. (*Id.* ¶ 126). Multiple elevated blood sugar readings in Plaintiff's NCDC medical records suggest Plaintiff's blood sugar was not under control. (*Id.* ¶ 127). Plaintiff disputes that he refused any insulin, arguing that Defendants have not produced any records of Plaintiff signing NCDC refusal forms.[6] (Doc. 124 ¶¶ 125–27). Plaintiff also appears to argue that medical staff were responsible for monitoring his insulin intake, his consumption of food, and A1C levels. (*See id.*).

---

[6] Defendants do provide numerous pages of a form titled "NCSO Diabetic Flow Sheet" for Plaintiff showing Lantus administration records between July 14, 2019 through March 3, 2020. (*See* Doc. 112-1 at 13–47). Approximately 10 entries during that time say "refused," but none of those refusals occurred between February 29, 2020, and March 19, 2020. (*See id.* at 39–41).

In general, a mean blood glucose of over 180mg/dL requires medical intervention, including insulin dosing, and elevated blood sugar levels, also known as hyperglycemia, can increase the risk of bacterial infections and decrease the effectiveness of antibiotics. (Doc. 112 ¶¶ 128–29).

Medical staff at NCDC can only provide the clinically recommended insulin dosing to a detainee based on their blood sugar levels, but they cannot force a detainee to take the clinically recommended insulin dose.  (*Id.* ¶ 132).

Plaintiff could have requested medical treatment at any time by submitting a sick call request and a visit would have been scheduled in response to the request, but Plaintiff did not submit any sick call requests to be seen by medical related to his alleged hand injury, which he admitted during his deposition.[7]  (*Id.* ¶¶ 137–38).  Making verbal requests on a nursing or medication line is not an appropriate way to advise medical staff regarding a health issue.  (*Id.* ¶ 146).  Medication lines are for medication distribution and administrations, not for sick call requests.  (*Id.* ¶ 148).

Plaintiff's NCDC medical records do not reflect any documentation of reported loss of grasping function in his right hand or inability to bend his finger.  (*Id.* ¶ 149).  Plaintiff asserts that Defendants acknowledge his hand was swollen, which "included obvious symptoms of lack of movement" and inability to bend his finger or grasp things. (Doc. 124 ¶ 149).

In the 11 days from the reported incident to the last entry in Plaintiff's NCDC medical records, Plaintiff was seen by nursing staff seven times, and Defendant Anderson saw him one time in person.  (Doc. 112 ¶ 156).  Defendants assert that an offsite consult including transportation to the hospital was not clinically indicated or required by the standard of care at any time during Plaintiff's treatment at NCDC.  (*Id.* ¶ 157).

---

[7] Plaintiff disputes these facts to the extent there is no policy that a nurse cannot treat an inmate who is in distress or has obvious signs of injury.  (Doc. 124 ¶¶ 137–38).

On April 19, 2021, Plaintiff was sentenced and transferred to the custody of the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR"), where he remains today. (*Id.* ¶ 209).

More than a year after Plaintiff's hand injury, an x-ray taken on June 30, 2021 revealed degenerative joint changes, as is common after injury and subsequent surgery, but Defendants assert that these changes take time to develop and could become visible on an x-ray later due to lack of mobility of the affected area, and they could not have been determined at the time of Plaintiff's incarceration at NCDC. (Doc. 112 ¶¶ 214–16). It cannot be said to a reasonable degree of medical probability that the degenerative joint changes were caused by the bite, infection, or surgery because osteoarthritis occurs when tissues in a joint break down over time and can be caused by a variety of ailments. (*Id.* ¶¶ 217–18).

Plaintiff attended physical therapy sessions between December 14, 2021 and January 25, 2022 and, at the January 25 session, he reported his hand was better than when he started physical therapy and he demonstrated significant improvement in mobility throughout the session. (Doc. 124 ¶¶ 220–31). Plaintiff has not received physical therapy on his hand since then. (*Id.* ¶ 235).

## V.     Fourteenth Amendment Legal Standard

"Pretrial detainees are entitled to 'adequate food, clothing, shelter, sanitation, medical care, and personal safety.'" *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)). "[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)).

To show he was deprived of his Fourteenth Amendment right to receive reasonable medical care, a plaintiff must show that defendants were objectively deliberately

indifferent to that right. *Id.* Unlike in the Eighth Amendment context, where a showing of subjective deliberate indifference is required, a plaintiff need not show subjective intent on the part of medical providers to establish a constitutional violation. *Id.* at 1125.

The elements of a pretrial detainee's medical care claim against an individual defendant are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071).

The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)). A plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

## VI.    Discussion

### A.    Defendants RN Montgomery and PA Anderson

Construing the facts in Plaintiff's favor, Defendants Montgomery and Anderson made intentional decisions regarding Plaintiff's medical care when they provided him with antibiotic ointment, Band-Aids, tried different antibiotics and combinations of antibiotics, pain medications, and probiotics. Thus, the first element of Plaintiff's medical care claim is met. *See Castro*, 833 F.3d at 1070 (noting that this first element would not be satisfied

only if the defendant's conduct resulted from something totally unintentional, such as an accident).

The second element considers whether Plaintiff faced a substantial risk of suffering serious harm.  This element is "purely objective."  *Id.*  The parties do not dispute that Plaintiff received an injury to his hand on or about February 29, 2020, that he suffered an infection, swelling and pain, multiple rounds of antibiotics were prescribed as well as pain relievers, and he eventually had surgery on his hand.  Based on this evidence, the second element is met.

Under the third element, Plaintiff must demonstrate that Defendants' actions were "objectively unreasonable," which requires a showing of "more than negligence but less than subjective intent—something akin to reckless disregard."  *Gordon*, 888 F.3d at 1125. This is where Plaintiff's claim falters.  The record reflects that Defendants Montgomery and Anderson both provided prompt and continuous medical care to Plaintiff after his injury at NCDC.  Accepting as true that Plaintiff saw Defendant RN Montgomery the day he was injured, Montgomery provided antibiotic ointment and Band-Aids to him. Defendants' expert, Lisa Meaker, opines that antibiotic ointment and wound coverage were appropriate initial treatment for a laceration and no additional treatment or referral was needed at the time.  (Doc. 112 ¶¶ 23–27).  Mintner further opines that the provider's prescription for Augmentin on March 2, 2020 met the standard of care because it is the drug of choice for prophylaxis antibiotic treatment, including of a bite.  (*Id.* ¶¶ 46–47).  The following day, Defendant PA Anderson ordered the discontinuation of Augmentin because Plaintiff's hand was not improving and to start Plaintiff on a combination of Doxycycline and Clindamycin in the event Plaintiff had a MRSA infection.  When Plaintiff's hand did not improve by March 6, Defendant PA Anderson went to the jail to examine Plaintiff's hand and ordered continuation of the antibiotics as well as Tylenol and Meloxicam for pain relief.  When RN Newby contacted Defendant Anderson on March 8 about Plaintiff's hand being warm and swollen, but blanchable, Defendant Anderson ordered the current antibiotics be discontinued and to start Augmentin 875/125mg twice daily, an injection of

1gm Rocephin, and Tramadol for pain if Meloxicam was not helping. On March 11, RN Newby contacted Defendant Anderson with an update on Plaintiff's hand, and Defendant Anderson discontinued Augmentin, and started Levaquin and Flagyl and an injection of Rocephin, and Lantus to address Plaintiff's elevated blood sugar. Defendants' experts both opine that it is clinically recommended and within the standard of care to explore various antibiotic protocols if a patient is not adequately improving and that overall, Defendants Anderson and Montgomery met the standard of care. (*See* Doc. 112 ¶¶ 26–27, 46, 49, 62– 64, 66, 78, 83, 88, 09, 101, 104, 106, 111, 113, 150–63). Although Plaintiff argues there is a different standard of care for diabetic patients, he has not presented any evidence of that standard of care if it differed from what Defendants Montgomery and Anderson provided. Nor has Plaintiff presented evidence showing what Defendants Montgomery and Anderson should have done differently according to a standard of care for patients with diabetes, including ordering an x-ray, during the days that they treated him.

On March 19, Plaintiff was released from NCDC to seek treatment for his hand and with a 30-day supply of antibiotics. Plaintiff sought care at an emergency department but was turned away because his condition was not life threatening (it was the start of the COVID-19 pandemic), and he eventually saw an orthopedic hand specialist on April 10, 2020. The specialist advised that since an MRI showed infection, Plaintiff would likely benefit from surgery, but the surgeon did not say surgery was imperative. The specialist performed surgery on April 14, 2020, including irrigation and debridement of Plaintiff's right index finger and took a tissue culture. Following surgery, the surgeon prescribed Augmentin, the same antibiotic ordered by Defendant Anderson.

Based on this record, a reasonable jury could not find that Defendants' Anderson and Montgomery's care was "objectively unreasonable" or that they recklessly disregarded a risk to Plaintiff's health. Accordingly, the Court will grant summary judgment to Defendants Anderson and Montgomery.

**B.    Defendant Sheriff Clouse**

Local government entities are considered "person[s] acting under color of state law"

18

1  who can be sued under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436

2  U.S. 658, 690 (1978). However, there is no respondeat superior liability under § 1983, so

3  to maintain a claim against Defendant Sheriff Clouse, Plaintiff must meet the test

4  articulated in *Monell*. Thus, Defendant Clouse may only be held liable under § 1983 for

5  his employees' civil rights deprivations if Plaintiff can show that an official policy or

6  custom caused the constitutional violations. *Id.* at 694.

7          To make this showing, Plaintiff must demonstrate that (1) he was deprived of a

8  constitutional right; (2) NCDC had a policy or custom; (3) the policy or custom amounted

9  to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom

10  was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.,*

11  *Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). Further, if the policy

12  or custom in question is an unwritten one, Plaintiff must show that it is so "persistent and

13  widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S.

14  at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). "Liability for

15  improper custom may not be predicated on isolated or sporadic incidents; it must be

16  founded upon practices of sufficient duration, frequency and consistency that the conduct

17  has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911,

18  918 (9th Cir. 1996); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal

19  policy includes the decisions of a government's lawmakers, the acts of its policymaking

20  officials, and practices so persistent and widespread as to practically have the force of

21  law.").

22          Plaintiff's claim against Defendant Clouse fails because, as previously determined,

23  he cannot show a constitutional violation based on this record. Accordingly, the Court will

24  grant summary judgment to Defendant Clouse.

25  ///

26  ///

27  ///

28  ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS THEREFORE ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 111), and the Motion is **granted**.

(2)     This action is **dismissed with prejudice**, and the Clerk of Court shall enter judgment accordingly.

Dated this 4th day of August, 2025.

Honorable Steven P. Logan
United States District Judge